Please be seated. Good morning. We're here for oral argument in Nicholas Bernard Acklin v. the Commissioner of the Alabama Department of Corrections. Patrick Mulvaney is here for the Appellant Acklin.  Judge Luck and Judge Grant and I are ready to proceed and as you know, Judge Grant will be participating by telephone this morning. Mr. Mulvaney, are you ready to proceed with your argument? Good morning and may it please the Court, Patrick Mulvaney here at Nicholas Acklin. The Supreme Court has recognized that inherent dangers arise when a person facing criminal charges is represented by an attorney and the attorney is being paid by a third party. The primary danger is that the third party payer will interfere with the representation and put pressure on the attorney to follow a certain course of action. That is what happened in this death penalty case. Two days before the capital trial, the defense attorney learned that his client, Nicholas Acklin, had been abused as a child by his father, but the father was paying the attorney. The father was furious that the issue of abuse had come up and he said to the attorney, you tell Nick if he wants to go down this road, I'm done with him and I'm done with helping with this case. At that moment, the attorney had conflicting interests. His third party payer was threatening to stop supporting the case if evidence of the abuse was presented, but the attorney knew that the evidence of abuse was important and could serve as valuable mitigation at the penalty phase of the capital trial. Okay, counsel. So I want to first start with the measuring stick by which we judge these things. So we've seemed to suggest in some of our cases that the standard for conflicts of interest and specifically the presumed prejudice standard, which you have been operating under both originally at the state court, in the district court, and here, does not necessarily apply outside of the successive or multiple representation context. Do I have that right or wrong and educate me on that, please. Yes, Your Honor. The Supreme Court has said that it's an open question as to whether the presumption of prejudice applies outside the context of multiple concurrent representation. We have cited a number of cases in our briefing in which this court has continued since the en banc decision in Friend v. Butterworth to apply the presumption of prejudice to various types of conflicts. The problem is, though, in the habeas context, we're in a bit of a different procedural posture, as you know. So in Schwab, for example, we said this, quote, at the time Schwab, that was the defendant in that case, at the time Schwab's conviction became final, and then it was 1996, so around the same time that this one did, became final, was, there was and since then there has been no Supreme Court decision holding that prejudice should be presumed to any extent where the attorney's asserted conflict of interest does not arise from concurrent multiple legal representation. That's the whole thing under 22d1. I understand that, Your Honor, and what this case, we are primarily traveling under 2254d2, that the state court's decision was an unreasonable determination of the facts. When the state court analyzed this, the Alabama Court of Criminal Appeals, which was the last state court to address this. So I just want to be clear, just because I want to close the loop, but I want to go there. You agree with me that Schwab closes the door for you for an unreasonable determination under the law or a contrary to determination of the law under 2254d1? Well, if there were, if the argument were about the presumption of prejudice applying under d1, then I would agree with Your Honor. But we actually are not arguing that the state court failed to apply a presumption of prejudice in violation of a clearly established Supreme Court law because the Alabama Court of Criminal Appeals did say that a presumption of prejudice would apply. So to the extent, we're relying primarily on our unreasonable determination of the facts, but to the extent that we're relying on subsection d1, it would be that the Supreme Court precedent does clearly establish that you have a right to conflict-free counsel, and then, but not on the prejudice. But it's never been, do you agree with me, it's never been applied in the habeas context outside of the multiple, the concurrent multiple legal representation context? Correct, Your Honor. Okay. I agree to find that a state court decision was unreasonable for not applying. Okay. So let's talk about d2, because we have some pretty recent law on it. What is the factual determination under d2 here? The factual determination is, it starts with the finding that when Theotis Acton made the statement that I told you a moment ago to Attorney Ramadi, that he never threatened to stop paying Ramadi if evidence of the abuse were presented. And we were certainly in agreement about that. So can I back up there and just push back on that a little bit? Because it seems to me that there's a difference between a finding of fact, which is what you're talking about here, and a determination under d2. It seems to me that the determination here, the factual determination, is that there was no active conflict of interest at the time that the statement happened. That's the factual determination. And then there are subsidiary facts that go into that determination. Do you agree with me on that? Your Honor, it's fair to say that the determination that there is no conflict is unreasonable. Okay. Yes. I just want to be... Sorry. I just... Because we're trying to narrow the issues here, all of us, to be able to understand this. You agree with me that the determination here under d2 was... There's two parts to it. But the first part was, there was no active conflict of interest at the time that Theotis told the attorney here what he said. Well, and respectfully, Your Honor, I think those two parts go hand in hand. The state court said he never made a threat. And I can address that in a moment why we think that's incorrect, but to try to answer the court's question. The finding that there's no conflict of interest based on a financial conflict, well, of course, if you don't find that that statement is a threat, then you wouldn't find that there's a financial conflict, because that statement is the basis of the threat. Okay. So, but... Okay. Again, I just want to be clear. Can we at least agree that under d2, the determination is there's no active conflict of interest? Whatever the basis for that determination was, we will discuss in a second. The basis is that there's no conflict of interest because there's no threat. Okay. Well, I think that second part is where maybe you and the state part a little bit, and I want to explore that, but I need you to establish the first part before we get to the second part. So, your contention is that the only basis of the state court's determination was that the statement of Theotis was not a threat. No, Your Honor. It's where this problem starts with the state court decision. There are, as you mentioned in the briefing, the state court also made a few statements after saying that the determination that there was no threat was after approving of the circuit court's quote of that. But none, what was the key premonition that says after that, none of it really contains any meaningful analysis of how you would analyze this situation if there was, in fact, a threat. And so, it's really all, it is all a fact. Why is that? So, I think what I understand you to be saying is you agree that there were other factors the CCA looked at, but you think those are wrong also, is what I think I hear you saying. But we'll get to the threat part, but it seems to me that the CCA also said, and it is well backed up by the facts in this case as I understand it, first of all, that there was no expectation of payment. That by the time this happened, the trial counsel here had no expectation from anyone that he was going to be paid anything. Do you agree that that finding was made by the CCA? Well, that finding to the, I, what the. Do you agree that finding was made by the CCA? No. What the CCA said was that he did not expect to be paid in full. And that's very different from did he expect to be paid more. We know that he expected to be paid more because within the three weeks before this meeting occurred, he had received $2,200. Two days before the meeting occurred, he requested more money from Theotis. And then seven times after the trial, he requested additional money from Theotis. I know those are facts. There are other facts. And it seems to me that if you read the long block quote that's adopted from the State that he wasn't expected to be paid in full, but simply that by the time this happened, he knew he was never going to get paid. Well, Your Honor, I think what the court was saying is that he was never going to get paid in full. That he was never going to get. And we don't dispute that part. But I do think that the record makes very clear. And to the extent that the State court said that, and it says at one point that he didn't expect to be paid, the Court of Criminal Appeals says he didn't expect to be paid the full retainer, that does not eliminate the conflict issue because we know from the record that he was trying to get more money from Theotis. We know that because of the letters he wrote. So there's no question that he was continuing to try to get payment from Theotis. So let's talk about the threat itself. I'm not sure I agreed with anything you just said right there, but let's put that aside for the moment. Let's talk about the threat itself. For us to overcome a fact-finding of the CCA, we are required to find that there simply is no other conclusion that could be reached other than that one. In other words, that clearly and convincingly that the fact that was found there was just wrong based on the record. How is that the case, based simply on the statement that I'm done with him? Tell him that I am done with him. Your Honor, here's why. First, I didn't just say tell him I'm done with him, he said tell him I'm done with him and done with helping with this case. Now, as initially, the primary way he was helping with this case up to that point was by paying the lawyer. How is that true? I know you say that and I know you write that, but how is that in fact true? He was helping with this case and he was going to play a critical role in testifying, which he ended up doing. That's the role that they wanted him to play, not to pay money on a $25,000 retainer for pittance that he was paying, but instead that he was going to be testifying in a very emotional way to the judge based on his experience as a minister or a pastor to say about his son why he should be gotten mercy and why the death penalty should not be imposed. That's how he was going to help. Well, Your Honor, up to that, I mean, Mr. Ramadi specifically reached out to him to ask him to contribute because- I understand that, but help, you're asking us to read that statement to mean help can only mean financial. Well, no, no, Your Honor. What we're saying is that help means all kinds of help. If you don't say, I mean, if a person is done helping- But it doesn't necessarily mean that. Yes, Your Honor, respectfully. So if someone says I am done helping with this case and the person is helping in three ways, done helping means they're done in all three ways. That's what the phrase is. No, no. It can mean that, but it can also mean I'm done helping with this case and tell him I'm done helping with this case, but have nothing to do with the fact that I'm also paying you on the side for services for a contract that you entered into with my ex-wife. How is one necessarily the other? How can I conclude nothing but from the trial judge who actually heard this stated, who was listening to the intonation, who heard it reflected, who heard the entire testimony about the relationship, how can I conclude that a state habeas judge who heard that was so wrong clearly and convincingly that he had to have meant what you're saying? Because it's an unambiguous statement. You guys, counsel, you and your co-counsel, you and your opposing counsel, want to treat this like a statute and you want to give me a statutory interpretation law on this. Testimony doesn't work that way. Statements don't work that way. When we talk to each other, it doesn't work that way. A statement made in open court on a cold transcript can mean many things, and a judge hearing that as the finder of fact can interpret it to mean one thing or can interpret it to mean another thing. How can I say that the judge hearing that clearly and convincingly was just wrong and there's no other conclusion that could be reached? Your Honor, I certainly take the Court's point about ordinary language, but this statement is as clear as a statement could be. Don helping with this case, even if we assume he's helping with the case. Can I ask you a question? You have not only a state habeas judge, you have three CCA judges, you have a federal district judge who all read this and reached a different conclusion than you. Now, I'm not saying that it cannot be that they are not clearly and convincingly wrong, all of them, but it seems to me a hard sell for you to say that all of them are just so wrong because this statement unambiguously excludes any indication that payment might be different from the help that he was going to provide, which is the testimony. That was it. He wanted him to testify. But, Your Honor, what he says is I'm done. I'm done helping with the case, period. And, you know, what I think is important here is that if we just think about the conversation for a second and think about Mr. Ramadi leaving, Theotis leaves the office, I don't think anyone who heard that exchange would think that Mr. Ramadi could walk out the door, go to court, present evidence that Theotis had abused his children, and then go collect more money from Theotis. I don't think anyone would think that. Why? Why? Because Theotis had just stormed out of his office being visibly angry saying, you tell me. Right. He was just confronted at that moment with the fact, in his mind falsely, that he had abused not just one but two of his children in a very serious way. He was angry at that moment. But how are we to conclude that there's no other way to think about this than that he meant I'm done, I don't want to speak to you, to him, to have anything to do with anything, especially when he phrases it as tell Nick, not I'm done with you, I'm never talking to you trial counsel ever again. Just to address the point about tell Nick, I don't think that that changes the meaning of anything. And in fact, if anything, what it really does is just highlight the level of interference that's going on here. I mean, the lawyer then is just being put in a position where he is delivering threats from his third party lawyer to his client. So the fact that he says tell Nick, he still communicated directly to Mr. Ramadi, the attorney. He's still receiving the message. And the message is, I'm done helping with this case if you go down that road. Now, what's significant then is that the attorney, within the next 36 hours, gets a waiver of the abuse evidence. OK, so hold on. I want to stop right there. So let's assume that you're right. Let's assume I agree with you on the first prong. As I read your brief, you suggest at that point that the whole thing becomes de novo. And we then can look at it fresh, and then we shouldn't use the waiver in order to find the prejudice part of it or prejudice presumed at that point. I'm not sure that that is exactly right under our understanding of D2 or de novo review. It would seem to me that the factual determination would then be reviewed de novo. And that factual determination, as you and I discussed, is whether there's an actual conflict of interest. But that is separate from a separate factual determination of whether that conflict of interest actually prejudiced or caused prejudice or resulted in prejudice in the representation. Those are different factual determinations. And just because the court got one wrong and we review one of those de novo, I don't think that bleeds into the second one, does it? Well, Your Honor, the issue, though, is that if, for a moment, the court accepts that this was a financial threat. And it's a financial threat to the lawyer that if you present the evidence of the abuse, I'm not paying any more. Right. I'm accepting your reading of that. And so at that point, the attorney has a duty under Supreme Court precedent to disclose the conflict of interest to the client. And so when the state court then justifies, kind of, wiggles out of the conflict by saying, well, he then went to the jail and got this waiver, so it's all OK. You're not answering my question. And I understand what you're saying, and we'll get there. But I need you to answer my question, which is, just because we review one fact de novo, and I'm agreeing with you on that one, doesn't mean we review the prejudice fact de novo. Do you agree with me? I'm sorry, Your Honor. Yes. What you were asking, I thought, was about the adverse effect from the conflict. No. What I'm asking is this. So let's assume the Kyler test applies. The state court made two determinations. Determination one, there's an actual conflict of interest. I'm assuming that you're right on that, and that we review that de novo. But fact two, or determination two, is whether there was an actual prejudice or actual effect on the representation is a separate determination that we now have to talk about. We don't review that de novo until you prove that that was an unreasonable determination, right? Well, and what I would respectfully argue, Your Honor, is that the unreasonable determination that it doesn't, that it's not a conflict in the first place, on these specific facts, necessarily colors the entire adverse effect analysis, because you either think... Counsel, how can that be right under Kyler, under Queller? In other words, if it's a two-part test, it can't be that I win on one, and so I necessarily  Those are separate determinations. Oh, no. Absolutely not, Your Honor. But the issue here is that the way the state court got out of this is by saying, well, there's this waiver. So... But please answer my question first. Do you agree with me that where you're right on fact one, on determination one, and we review that de novo, that does not necessarily mean we review fact two de novo? That would not necessarily mean that. Okay. However, in these, what I argue, in these circumstances, where what happens next is that the attorney, without informing the court, privately goes and gets this waiver, then if the conflict is accepted, then the conclusion that the waiver cures the conflict is undermined. Well, it's not that the waiver cures the conflict. What the CCA found was that the waiver is evidence of the fact that it didn't affect the representation because he would not allow his attorneys to present this evidence to the court under any circumstances. But Your Honor, if we accept the first part, that there is, in fact, a conflict of interest, then we look at that waiver very, very differently. And that's based on the fact that he did not know about and consent to the third-party payer arrangement, right? That's correct. That he did not know and consent to it. A conflict of interest. Right. That he didn't know or consent to that arrangement. Well, it's more, it's more than the arrangement, Your Honor, because... Well, no, that's, I don't, I don't know that I agree with that. How, in other words, you either agree to this, that there's this payer arrangement that, that allows for potential conflicts, or you don't? No, Your Honor, I don't think that's accurate. And I'd point to Zuck versus Alabama, which is a case from this court, where the, the situation in Zuck was that the person did know about the factual, the facts underlying the conflict. But what this court held is that he wasn't told that there is a conflict of interest, and then there are certain protections that come along with that when a conflict is disclosed. The protections include, you have a right to independent counsel, you know, the court will, the court can address whether you want to have a waiver of the conflict, and that is something intelligent and voluntary. And so I don't think it's just to the third-party arrangement, because... What about, counsel, what about the fact that, that the CCA found over and over again, as did the State Habeas Court, that counsel put in, despite whatever payment, since there was no expectation of any additional payment, despite any, not having been paid, put in 400 hours, in fact, even more, worked this case up significantly. In other words, that the fact that he wasn't going to get paid did not appear to affect his work in any way whatsoever, and didn't from day one when he wasn't paid, and didn't until the end. Well, Your Honor, the, the critical part here, I mean, they, they didn't learn about the abuse until two days before trial, and I think that time frame, and we're not saying, just to be clear, we're not saying that the third-party payer arrangement itself created a conflict of interest. We're saying that when it, when it escalated to the attorney learning about the abuse, and then, when he had the conversation with DeOtis, and that explicit statement was... I know, but counsel, if... That's one of the... But, counsel, if the CCA had two years of representation indicating that lack of payment didn't matter at all, and it didn't, then why is that not, why is that an unreasonable factual determination to then say, when he threatened nonpayment at that point, it didn't affect anything because he knew he wasn't going to get paid all that time beforehand, and he worked his tail off to present everything? Why can't the court use that past in order to make a determination about what the attorney believed and how it affected his representation going forward? Two thoughts on that, Your Honor. First, you know, it would be, it would be perfectly possible for an attorney to be effective for the two years, but then have a conflict arise, and then the conflict... I agree, but we're not, counsel, we're talking about the factual determination. Why is that not evidence supporting the, the CCA's factual determination regarding whether the conflict affected the, whether conflict affected the representation? Well, because we know from his own actions that he was trying to get paid more, and as recently as... I understand they're counterfacts. You have facts on your side. That's not our question. Our question is, is the determination unreasonable? Can no reasonable jurist, looking at this factual record, have made the same determination? Your Honor, no reasonable jurist could make that determination. How? When you have an attorney who wasn't getting paid for two years, and who appeared to work his tail off, how could it then, the conclusion that he, the payment was not important to him, and he was going to do whatever he needed to do to represent his client. He said so. I am going to do whatever I have to do to get this evidence in. How, how is that an unreasonable determination by the court? Well, Your Honor, I think that, that last statement is really important. I just asked for an opportunity to address it. What he said after the meeting is, I'll do whatever I need to do to get you to the sentencing phase. And I think it's really important to emphasize here that he did. He did exactly that. The only way to get Theotis to that sentencing phase was to make sure that the evidence of abuse was not going to be presented. That's what he did. And so, I think we have to step back and look at this, and also, he, when he, the court talked earlier about him testifying at the penalty phase, and he did testify. But the attorney put it out to testify that he was an overly protective parent, that discipline was not an issue at the home. These are seriously problematic statements from someone who, the attorney knew that those statements were inaccurate. In fact, he testified in the post-conviction proceeding, I couldn't agree, based on what I knew, with the judge's final conclusion, which was based directly on Theotis' statements. And so, when you, when we look at the whole picture, he did exactly what is there. Isn't the whole picture, whether, in terms of affecting representation, doesn't this only go to one single mitigating factor when the conclusion of the CCA was both individually and together, the aggravating factors far outweighed any evidence that would have been presented, including this evidence of mitigation? How can we say that this, whatever potential conflict affected the representation where that's the case? Well, you are one, one mitigating factor in the sense that it's, it's the mitigating factor that the Supreme Court has said repeatedly is incredibly important at the penalty phase of a death penalty case. Right, but the CCA looked at all of that and made a conclusion that the decision would not have changed. How is that unreasonable to, to make that? It's unreasonable for, for this reason, Judge. In, you know, in many cases where this court is looking at making a prejudice determination based on, on the omission of evidence, a lot of times what the court says is, well, this is just kind of more of the same. It's cumulative. It's, it's the same kind of evidence that was presented at trial, it's just more, it's more detailed. So this is the rare case in which the evidence presented to the trial court, which is not accurate and the trial court then made findings that Nicholas Acklin was not subjected to dysfunction and abuse, which the attorney knew were false and he didn't object. So this is the, I mean, it's, it's the complete opposite of what was presented and Nicholas Acklin was, was entitled to an individualized sentencing determination based on his record, his character, his background, his life. That didn't happen here. And, and it can be traced directly to this conflict of interest because the third party payer didn't want this abuse evidence in. The third party payer wound up testifying that, you know, I am an overly protective parent. And, and so the integrity of this death sentence is completely undermined by this entire arrangement and the attorney putting the files on the stand. Okay. Now, Judge Grant, you're still with us, right? Yes, I am. Do you have any questions? I don't. Thank you. Okay. Well, let me just ask you one question, counsel. Are you conceding that prejudice cannot be presumed when there's an actual conflict of interest that adversely affects a client's case in a single defendant case? Are you conceding that? No, Your Honor. The only thing that we would concede along those lines is that under, that it wouldn't be clearly established federal law if the state court had not applied that presumption and then it was before this court and there was a D1 argument. But in, if this court gets past that by, by finding that the entire, that the conflict analysis, as we were discussing before, is an unreasonable determination of the facts, then when, when we get to prejudice, when we get to a de novo review, we would suggest that the court would apply circuit precedent, which is that the, the presumption of prejudice applies to various types of, of conflicts of interest. All right. We have your argument and you have reserved some time for rebuttal. We will hear from Mr. Hautz on behalf of the commissioner. Thank you. May it please the court, good morning, I'm James Hautz and I represent the commissioner in this appeal from the denial of habeas relief in the Northern District of Alabama. As to the sole issue before the court this morning, the district court did not err when it affirmed the denial of the state court and found that its treatment of the actual conflict of interest claim that Mr. Ackland presents was neither an unreasonable application of federal law nor an unreasonable determination of the facts in the state court record. Because this is such a fact intensive issue, I would like to begin this morning with a brief discussion of the facts surrounding the actual fee agreement in this case. It's undisputed that Ackland's attorney, Mr. Hermadi, was retained by his mother, Velma Evans, in September of 96 and at the time that she retained him, she was divorced from Mr. Ackland's father, Theodosius Ackland. It's also undisputed that after she entered into this fee agreement, that case proceeded for 18 months with her being the sole source of likely payment under that contract. And as to that point, at this point... How does that affect the conflict issue though? I mean, if he started paying and payment was sought from him, both from letters and from the attorney's office, then how does that not affect the conflict of interest issue? Just because she, the mother, happened to sign the retainer agreement. Because the true third party payer in this case, Your Honor, is the mother, Velma Evans. She's the one that had the debt, the contractual obligation. If anybody was owed a duty that we assume is created under this type of situation, it would be Ms. Evans, the one who brought forward the allegations of the abuse. Let me be clear. I don't think your opposing counsel is saying that he's on the hook legally for the money. I think what they're saying is he started to pay and he threatened to stop paying and payment was sought after he then flipped his testimony or testified differently to what the attorney understood the facts to be. That's the conflict here. Whether he's legally obligated or not, it seems to be sort of besides the point. Why is it not besides the point? That highlights, in my opinion, where my friend's argument goes off the rails, and that is this. This case is as much about the silent or ambiguous record that was left following the state evidentiary hearing and the fact that an attorney is presumed to provide reasonable professional competence assistance. That presumption cannot be rebutted by a silent or ambiguous record. So he's asking the court today to infer that somehow Ramadi just decided to follow after Theotis Acklin with only dollar signs in his eyes, a very pessimistic view of the law. How is I am done helping him ambiguous? So you're right if there's silence or ambiguity, that would defeat, I think, any determination that the state court's factual determination is wrong. Their argument is that this isn't ambiguous. It says I am done helping him with this case. How is that ambiguous in any way? We can first look at you still have Ms. Evans and he's asking you to assume that somehow Ramadi said forget the person that signed the contract. Forget the mother who brought me the abuse allegations. I'm going to go chase after Theotis. That brings you to the actual facts of what occurred in the aftermath of the abuse allegations being presented. First, Ramadi said he immediately recognized it as mitigating evidence that would need to be presented at any potential penalty phase. When he received the you tell Nick speech from Theotis Acklin, he didn't try to soothe Theotis' feelings. He didn't try to keep him in his office and repair this allegedly lucrative relationship. He said I'll do whatever I need to do to get you into court. He then went to his client to confirm the allegations of the abuse that was given by the mother. When the client confirmed what the mother said, he said we need to present that in court. Those are not the actions of a lawyer who's operating under divided loyalty. But when Acklin said I don't want to put my family through the ordeal of having this aired in open court, this isn't why I'm in jail today. This isn't what caused this. What's missing from this scenario is advising his client that I do have a conflict of interest. He didn't tell him he had a conflict of interest in that, you know, you have the option of retaining new counsel. If there's a conflict, it's not in this waiver. So why is this a knowing and intelligent waiver if the client was never advised that his counsel has an actual conflict of interest? My response, Your Honor, would be Mr. Acklin can't have it both ways. If this you telling me speech truly was the obvious, actual, apparent conflict of interest that he tells the court today it was, then if you look at pages 28 and 29 of the commissioner's review that Ramadi testified that he spoke to his client about his interactions with Theotis, and when asked if he told Acklin everything that his father said, he responded yes, sir. When asked if that included the manner in which Theotis left his office and the things he said, Ramadi answered affirmatively. So he was never, he was never advised that his lawyer had a conflict of interest? Well, if it was an obvious, if those facts create an obvious and apparent conflict of interest, on that record, yes, Acklin knew at that point the facts that underline this apparent conflict of interest. But highlighting the fact that they were That's not, that's not in the statement that he signed, though. There's nothing about that in the statement that he signed. You're just, you're just presuming that. I'm not. It's in the testimony that was provided by Mr. Ramadi, which was unrebutted by Mr. Acklin. Let's talk about the solid or ambiguous record, Your Honor. He subpoenaed Theotis Acklin to the State of Administrative Hearing. Theotis Acklin appeared. Theotis Acklin was never called to testify. But your, let me be clear, though, this going to Judge Wilson's question. Your opposing counsel says that the law in this circuit is not enough that someone know the underlying facts of the conflict, but that they have to actually be advised that the attorney has a conflict of interest. That's the legal standard. And so I want to ask the same question that Judge Wilson asked. Is there evidence in this record that Mr. Acklin was told at that point, assuming there was a conflict of interest, that there was a conflict of interest? Not just the underlying facts of what happened, but that that caused the attorney to then have a divided loyalty. When he signed that statement, and not later, after the fact? Well, no, because Ramadi never testified that he had a conflict or felt that. And again, that's a shortcoming in my friend's argument, in that he cites to this court Supreme Court precedent saying that attorneys should disclose conflicts of interest. What he omits from his argument, and if you look at page 347 of the United States Reporter of Sullivan, is that court's observation about disclosing a conflict that the attorney is in the best position professionally and determined when a conflict exists. And that observation came from the court's previous Holloway decision, which was also relied upon by the appellant. But Acklin not once asked Ramadi, hey, did you feel professionally and ethically conflicted once Theotis said that? You have to think, the two people whose mental operations are key to the decision in this case are Ramadi, what effect did you tell Nick's speech have on your mind? And Theotis, what did you mean when you said that you tell Nick's speech? Neither one of those witnesses were asked about their mental operation, which is why we have a solemn and vigorous record that we're talking about. But that goes to whether, that goes to my question, which is really the question of your opposing counsel. Which is, what ambiguity is there in the statement of, tell Nick, I am done with him, I am done with helping with this case? I mean, what ambiguity is there? Other than, I'm not helping in any way whatsoever in whatever matter. The ambiguity is what effect did that have, if any, on Ramadi? Because again, when Theotis Acklin made contributions, he was either doing- Well, that doesn't answer the first part of the test. That may answer the second part of the test. But the first part of the test is, is there an actual conflict of interest? In other words, it either exists or it doesn't. The effect part is the second part of the test, and we'll get to that. But my question is, is there any ambiguity in that statement? And if there's not, then that, doesn't that create an actual conflict of interest, which is the first part of the Quayler test? The statement doesn't mention finances or payments, and it was made by a person who had no legal obligation to fund Nick Acklin's defense. So yes, there's ambiguity there, which is why this court must look to, did it, would it create a conflict in the mind of Ramadi? Because that is the question of whether an attorney is conflicted. What effect, how does the attorney perceive it? Because it doesn't mention money, and it's not made by somebody that has any legal obligation to pay. And the attorney actually said that when all this was transpiring in 1998, he remembered sensing that Velma Evans was more committed to her son's defense, and he respected her more than the father, because he never felt like the father was as invested in the son's defense. Those are not statements from an attorney who would accept that statement as being, oh, I've been financially threatened, let me run off and do Theotis Acklin's bidding. And everything he did after that shows that, I mean, as the district court observed, if that was intended to be a threat, it wasn't a good one, because there's no evidence that Ramadi perceived it as such, and there's certainly no evidence that it affected or impaired his judgment thereafter. Well, the effect part goes to the second part of the test, so maybe let's talk about that. Your opposing counsel says that you can't use the waiver, as Judge Wilson says, because you're sort of bootstrapping. If there's a conflict, you can't then take a conflicted lawyer and get a waiver from somebody without disclosing that conflict. It really isn't a knowing and intelligent waiver at that point. So how can we count the waiver as part of the effect analysis? Well, one, I think you have to look at the facts and circumstances of, he's going to, one, ask his client, is this true? He's going to advise his client, you need to present this at a penalty phase if it is true. And it's only when the client says, I don't want to do that, that the issue of the waiver comes up. I would agree with the court that it would be relevant had Mr. Ramadi gone to jail that day with a prepared waiver in his file and started advising his client, we don't need to go down this road because if you do, your dad's done with this case. He's not going to pay me anymore. But he didn't do that. He attempted to advise his client to do the opposite, to present the evidence. And my friend says that the fact that this was all done quickly is evidence of the fact that he was operating under a conflict. I would remind the court that the trial started two days later. If his client was going to make this decision that the lawyer disagreed with, he needed to make sure that his client clearly understood the nature of the evidence that they were talking about, and that he clearly understood his client's instructions not to pursue that evidence so that he could return to more fruitful and productive lines of preparation for trial. Again, that's only starting two days away. One other issue I'd like to address is that my friend says that he was conflicted because he never disclosed this waiver to anyone outside of the attorney-client relationship. However, once Acklin instructed his lawyer, and there's no allegation in the record that Ramadi had any reason to believe that Mr. Acklin was incompetent, Rule 1.6 of the LLM Rules of Professional Conduct would have limited the disclosure of confidential client information, which is much broader and privileged information, to those that the client had no representation, and Acklin never testified that this was the case, and Ramadi's testimony shows the opposite. Mr. Acklin did not want this made public. What other evidence is there on the second part of the Quayler test? So let's put the waiver aside. What other evidence is there that if they're assuming there was a conflict of interest, that that conflict of interest did not affect the representation in this case? Well, again, I go back to, if this had an effect on Ramadi's behavior, the first thing I would expect is to see Ramadi say, hey, Theotis, calm down. Don't leave. Come back, sit down. Let me repair this lucrative relationship that I'm so invested in. He didn't do that. Instead, he just pointed at him on the way out the door and said, I will do whatever I need to do to get you into court. Then he went and confirmed, the other thing I would say is he recognized this as the evidence. That's without advising him of the fact that he has a conflict, though. I'll have to disagree with Your Honor. The presumption that he has a conflict. The Supreme Court in Holloway, Colyer, Wood has said that there are circumstances that lead to a higher possibility of a conflict. And they have sent it back to trial courts to say, you should have inquired in this case as to whether there was a conflict and what was going on in this case. But I go back to what the Supreme Court said. The attorney is in the best position to know whether they're under a conflict. And that especially applies when the alleged conflict is a supposed threat that doesn't mention money and is made by a person that isn't a part of the fee structure, the fee arrangement. And in that case, that goes back to why did Mr. Ackland not ask for money at the hearing when he had him on the stand? What effect, if any, did that statement have on you? How did you perceive Theotis' statement? Why did he not call his father to the stand and say, what did you intend? What did you mean when you made the statement? Because again, mental operation is something that typically can only be testified to by the witness whose mental operation is at question. So that goes back to a silent or ambiguous record that cannot be used to rebut the presumption that counsel was exercising a reason to question Theotis. Was Ackland's sentence based on perjured testimony that Romani knew was perjured and failed to disclose to the trial judge? I don't believe that's accurate. And I would also disagree with my friend's assertion that Theotis was somehow the center of this penalty phase presentation. If the court looks at volume 10, tab 28, the penalty phase presentation in this case was a former co-worker. Theotis' testimony wasn't perjured testimony at the sentencing phase of the trial. When he testified that Ackland grew up in a loving family with good parents, the church on Sundays, good parents, and the judge factored all that into his sentencing decision, that's not perjured testimony that the lawyer knew was perjured. As Romani testified at the evidentiary hearing, his belief based on Theotis' response to the abuse allegations was that if Theotis was asked about it in court, that he would deny it, which is what Theotis did. I'll also go back to Romani talked about the fact that Ms. Evans, during the divorce, did not have custody of the children. Because this wasn't fully investigated and fully developed, he had no reason ... It wasn't perjured testimony? I don't believe he will only present perjured testimony on the fact that his client said, don't go investigate this. So it certainly ran counter to what he was told by Velma Evans. It certainly ran counter to what his client had told him. That's not the same as perjured testimony, Your Honor. But again, I would just like to leave the court with the fact that if you look at a police officer, former co-worker, a counselor, two ministers, Mr. Acklin's mother, a grandmother, and an aunt, and then add Theotis Acklin, it's very unfair to say that Theotis Acklin was the center of that penalty phase presentation. Once he had the waiver, what was the strategic ... So in other words, once trial counsel was instructed by Mr. Acklin to not present, and I forbid you from presenting evidence of abuse by anybody, not just by the father, but by anybody, what was the strategic decision made by trial counsel at that point for mitigation? In other words, so I can't go the abuse route. I'm not allowed to. What was the decision made and how did he go about presenting that evidence? I mean, again, at that point, I believe his testimony was, once he got the waiver and was told, they went back to preparing for the trial that the court sees in the record, which was the mitigating witnesses that were actually called at the penalty phase. Didn't he testify then at that point that his strategy was to ask for mercy, was to sort of go the mercy route as opposed to, he did this because he was abused route? In other words, he had to make a sort of a strategic decision to go a different way than he went the other way, right? I don't recall specifically at this point how his testimony was phrased, but I do know that Mr. Ramadi testified that his client told him, one of the reasons I don't want this presented in court is because that abuse did not cause me to be here today. So that would definitely have an impact on how his judgment is moving forward. Before my time expires, I would also like to mention, it didn't come up earlier, but the seven letters that my friend relies on to say that somehow this case is different. And I would like to point out a few things about the seven letters that were sent to Theodosia Ackland after the trial. First, there's no evidence that Ramadi was even aware that they were sent out. On pages 44 to 45 and 51 of volume 40, tab 90, Ramadi testified that his secretary would often sign such matters involving billing. He only testified that he had signed one such letter in August of 1999. Second, the letters themselves are contained on pages 42 to 80 to 86 of volume 36, tab 89 of the habeas record. They are all dated on the 15th or 16th of each month, which Ramadi testified appeared to be the billing cycle for that case. And I would remind the court, Coderno v. United States didn't hold that an attorney who wasn't paid a fee by their client was barred from subsequently trying to collect that fee at risk of being accused of having subordinated their responsibility to their client to their own pecuniary interests. Finally, there was no testimony that only Theodos was receiving letters and not Velma after trial. It's true that Ackland only introduced the letters that were sent to Theodos after trial, but the testimony was that both Velma Evans and Theodos receiving those letters as part of the billing practices of the firm. So for that reason, there's nothing special about the fact that parties who were being billed before trial continue to be billed after trial, and that doesn't set aside Ramadi's testimony that by this point, it wasn't that important to him because he was so focused on preparing for trial. And he favored Ms. Evans over Theodos because he never felt like Theodos was fully invested in his son's legal defense. In the end, I would ask the court to go back to the fact that even in these cases, the court is required to presume the counsel exercised reasonable professional judgment in the representation of a client, and that is a presumption that cannot be rebutted by silent or ambiguous record. And all of the guesses the court is being asked to make about the mental operation of witnesses and what statements that don't mention threats and weren't made by a third-party contractual obligee is because there is a silent or ambiguous record in this case. Well, this isn't dispositive, but I'm not sure I understand why prejudice cannot be presumed if counsel has an actual conflict of interest that adversely affects the representation of his client in a single defendant case. It may be that it could, Your Honor. But as to that question, until it's resolved by the Supreme Court of the United States, the state court is free to reach a different determination than this court under ADEPA. And if that's what happened in this case, that is not a ground for granting Mr. Ackland relief. Because Ramadi testified below, Your Honor, that he took multiple actions, that would be absolutely inconsistent with viewing that statement as a threat or as a threat that had an impact on his later performance for Mr. Ackland. It goes a long way to resolving this issue under ADEPA because, as Judge Lutt pointed out earlier, Mr. Ackland cannot obtain relief unless the state court could not have reasonably reached any other determination other than that you tell Nick speech was an unequivocal financial threat directed to Ramadi that subsequently impaired his professional judgment. And while Mr. Ackland may disagree with the conclusions that were reached from the factual determinations by the state court, he has not shown that the state court's determination on this issue was so lacking in justification that there was an error well understood in existing law beyond any possibility of fair-minded disagreement. As such, the district court properly denied habeas relief under ADEPA, and this court should affirm. If there are no other questions from the court, the commissioner asks that this court affirm the denial of habeas corpus relief by the Northern District of Alabama. Thank you. Judge Grant, do you have any questions? No, thank you. Okay. All right. Thank you, Mr. Houts. Thank you, Your Honor. And Mr. Mulvaney, you have reserved some time for rebuttal. The question of whether a conflict of interest arose here, it's a factual showing of inconsistent interests. The question is not whether Mr. Ramadi testified that he was hampered by this or that. This court has actually found conflicts of interest, even where the attorney said, I wasn't affected by this, because it's a factual showing of inconsistent interests. Now, in light of the threat that was made, the conversation between Diotis and Nicholas Acklin, those conversations never should have happened without disclosure of a conflict. The conflict of interest had to be disclosed. And the reason for this is that, as the Supreme Court has explained, conflicts of interest can have subtle, even unconscious effects on lawyers when they're delivering this type of important information. It's difficult to measure the precise effects of how a conflict is going to affect a lawyer in a private conversation with a client. And that's why we want disclosure. That's why disclosure is required by the Supreme Court. And with respect to the timing, I don't know any reasonable conflict-free attorney who would be in such a hurry to get his client to sign a document waiving the most important mitigating evidence in a death penalty case. The fact that he had one meeting with Nicholas Acklin and then went back and typed up a waiver, I think when we look at that alongside the fact that he then called his third-party payer to testify, I think the court should be skeptical that the waiver can somehow cure what happened before with respect to the conflict. Now, in terms of adverse effects, there are many adverse effects of the conflict of interest in this case, starting with the failure to disclosure, even though failure to disclosure on its own wouldn't be a sufficient adverse effect. But he didn't disclose the conflict to Mr. Acklin or the court. He didn't request a continuance, which is something many lawyers, I think, would do in this situation, learning of important evidence two days before trial. He called Theotis to testify. He asked him questions about discipline, knowing that he wasn't going to reveal the abuse that happened. He then called him again at the judicial sentencing proceeding and allowed Theotis to portray himself in this positive light. Then when the trial court said in its sentencing order, Nicholas Acklin, most people convicted of capital offenses are the product of abuse or dysfunction, but Nicholas Acklin was not. He didn't object. And then when the sentencing order came out, it said something similar again. He didn't object. To Judge Wilson's question, did he know? Did he know that this evidence was inaccurate? Yes, he knew. He was asked at the post-conviction hearing, and this is in volume 40, tab 90, page 151, did you agree with Judge Smith in the sentencing order when he said Nicholas Acklin was not subject to abuse and dysfunction? He said, no, I couldn't agree based on what I knew. I couldn't agree based on what I knew. So yes, this was inaccurate testimony, exactly what his third-party payer had asked him to do. The jury in this case, even without, back to the discussion we had earlier about prejudice, the jury in this case, even without this evidence, was 10-2, the minimum number of votes for a death sentence under Alabama law. And so what it would have taken for that jury to not return a death recommendation was one that Nicholas Acklin had been severely abused as a child. The abuse, the evidence of abuse in the record is overwhelming. Velma testified in detail about the violence, the abuse. Steve Acklin, Nicholas Acklin's brother, talked about how Theotis, the father, would threaten them with guns. Records from the state agency in Alabama that responds to child abuse corroborate that that is what was happening. These are government records contemporaneously created. Hospital records confirm it. Mr. Ramadi believed it, and when Mr. Ramadi talked to Nicholas Acklin about it, he confirmed it. In this case, the sentencing judge imposed a death sentence based on a fundamental misunderstanding of the critical facts about Nick Acklin's life. This was not an individualized sentencing determination about Nicholas Acklin. It was a trial court that was misled by an attorney who presented evidence from his third party payer to portray the third party payer in the most positive light possible to the detriment of his own client, Nicholas Acklin. We respectfully request that this court reverse the district court's judgment and remand this case with instructions debating Nicholas Acklin's death sentence. All right. Thank you, counsel. Before we conclude, Judge Grant, any questions? No, thank you. Okay. Thank you, counsel. Court is adjourned. All rise.